# EXHIBIT A

REDACTED
IN ITS
ENTIRETY

# EXHIBIT B

```
 1            IN THE UNITED STATES DISTRICT COURT

 2              FOR THE DISTRICT OF DELAWARE

 3    TQ DELTA LLC,              :
                                 :
 4             Plaintiff,        : No. 13-1835-RGA
                                 : No. 13-1836-RGA
 5        v.                     : No. 13-2013-RGA
                                 :
 6    2wire Inc.,                :
                                 :
 7             Defendants.       :


 8

                      Thursday, October 30, 2014
 9                    4:00 p.m.


10

                      Conference
11                    Chambers of Judge Richard G. Andrews

12                    844 King Street
                      Wilmington, Delaware
13

14     BEFORE:    THE HONORABLE Richard G. Andrews,
                   United States District Court Judge
15

16     APPEARANCES:

17

                   FARNAN LLP
18                 BY:  MICHAEL FARNAN, ESQ.

19                              -and-

20                 MCANDREWS, HELD & MALLOY, LTD.
                   BY:  PETER McANDREWS, ESQ.
21
                      On behalf of Plaintiff
22

23

24
```

1        APPEARANCES CONTINUED:

2

3                    MORRIS JAMES LLP
                     BY:  KENNETH DORSNEY, ESQ.

4                              -and-

5                    ALSTON & BIRD, LLP
                     BY:  ELIZABETH RADER, ESQ.

6
                         On behalf of ZyXel Communications,
7                        Inc.

8

9                    MORGAN, LEWIS & BOCKIUS, LLP
                     BY:  COLM CONNOLLY, ESQ.

10
                         On behalf of Pace Americas, Inc.
11                       and 2wire, Inc.

12

13                   SEITZ, VAN OGTROP & GREEN, P.A.
                     BY:  JARED GREEN, ESQ.

14
                         On behalf of Zhone Technologies
15

16

17

18

19

20

21

22

23

24

```
 1                    THE COURT:  Good afternoon, and

 2       please be seated.  This is the conference in TQ

 3       Delta LLC vs. 2wire, Inc.  Civil Action Nos.

 4       13-835 and also 13-836 and 13-2013.  It will be

 5       useful to have on the record who's representing

 6       who here.  Mr. Farnan?

 7                    MR. FARNAN:  Michael Farnan for

 8       the Plaintiff, and with me is Peter McAndrews

 9       from McAndrews, Held & Malloy.

10                    THE COURT:  All right.  Good

11       afternoon.

12                    MR. McANDREWS:  Good afternoon,

13       Your Honor.

14                    MR. CONNOLLY:  Colm Connolly, Your

15       Honor, for Pace and 2wire.  Good afternoon.

16                    MR. GREEN:  Good afternoon, Your

17       Honor.  Jared Green on behalf of Zhone

18       Technologies.

19                    MR. DORSNEY:  Good afternoon, Your

20       Honor.  Ken Dorsney on behalf of ZyXel.  And

21       with me is my co-counsel Elizabeth Rader from

22       Alston & Bird.

23                    THE COURT:  I believe I've met you

24       before, Ms. --
```

```
1                   MS. RADER:  Rader.

2                   THE COURT:  Ms. Rader, yes.  I was

3        going to say Ms. Byrd because it's the last name

4        I heard.  I want to thank you all for coming.  I

5        do have a question.  I originally got this

6        protective order that seemed to have a place to

7        make a choice and I don't recall there being any

8        actual requests that people wanted to argue the

9        choice which would involve writing those kinds

10       of letters that I got after I made the choice.

11                  Did I misunderstand something or

12       what was going on there?

13                  MR. FARNAN:  Your Honor, it was

14       probably my fault.  We were working with Your

15       Honor's new procedures so your new procedures

16       were essentially put argument in a joint letter

17       or just submit opinion proposals, so when we

18       submitted the opinion proposal, it didn't

19       include the argument.

20                  THE COURT:  Okay.  All right.  No

21       problem there.  But a lot of times I will get

22       something and it will -- if there's going to be

23       some argument, I would like to know because then

24       I will wait to get the argument as opposed to
```

1   looking at it, trying to make a decision, making

2   a decision and then getting the argument

3   afterwards.

4                So I have a letter signed by Brian

5   Farnan on October 9, 2014 and I think the other

6   two letters are essentially the same as

7   Mr. Connolly's letter of October 15th and I

8   brought with me the page of the protective order

9   where it said prosecution bar.  That's Paragraph

10  13.  No individual retained by -- and then there

11  was the dispute where TQ Delta's position was

12  either party and 2wire's position was Plaintiff,

13  and I chose Plaintiff, including in-house or

14  outside counsel and/or outside consultants whose

15  access to any producing party's highly

16  confidential attorneys eyes only or highly

17  confidential source code material may without

18  consent of the producing party engage in any

19  prosecution activity involving claims relating

20  to DSL technology during the pendency of this

21  action for a period ending two years after, and

22  then there's the termination dates.

23                So I get the impression that TQ

24  Delta says this is unfair -- you may have a more

```
1     legal term for that -- because TQ Delta does

2     something beyond prosecuting the patents that it

3     has bought or inherited from other people?

4                    MR. McANDREWS:  That's correct,

5     Your Honor.

6                    THE COURT:  All right.  So what is

7     it that you do that you want to tell me about?

8                    MR. McANDREWS:  Your Honor, TQ

9     Delta actually is an extension of the prior

10    patent owner Aware.  Aware was a company that

11    effectively -- their product that they produced

12    was actually not necessarily a tangible product.

13    The business of Aware was to generate referenced

14    designs.  So in some sense of the word, Aware's

15    business was intellectual property.

16                    Although I guess you could say

17    it's taking what is sufficient for a patent and

18    a patent application enabling disclosure and

19    taking it down to something a little more

20    specific in the terms of source code.  So to the

21    extent Aware had brick-and-mortar in products,

22    it was something that was somewhat more tangible

23    than intellectual property.  Nevertheless, it

24    was never a product in the sense that the
```

1      Defendants are using the term.

2                In any event, that effectively

3      brick-and-mortar was sold to a company called

4      Lantic(ph).  Lantic took that aspect, the

5      reference design aspect of the business, but

6      left Aware with the patents, the intellectual

7      property.  They also left Aware with the two

8      main brains behind the intellectual property, an

9      individual named Michael Zanos and an individual

10     named Marcos Zanos.

11                Michael and Marcos Zanos traveled

12     with the patent portfolio with TQ Delta.  They

13     are not employees of TQ Delta so I'm not

14     intending to misrepresent them as employees.

15     However, they are consultants and

16     representatives of TQ Delta in their ongoing

17     inventive work.  And what I mean by that is they

18     continue to develop DSL technology which is the

19     technology in the case.

20                They continue to contribute those

21     technologies to the ITU which is the

22     international standards body that governs DSL

23     technology, so that's the ITU.  And they

24     participate on a monthly or maybe even

1    bi-monthly basis in contributing their ideas.

2    And those ideas are brand new technologies in

3    some cases which will lead to development of a

4    next generation DSL standard, but they are also

5    improvements to the existing DSL standards.

6                    If Your Honor wants some

7    evidence -- this is Mr. McAndrews on the facts

8    here, but if you would like some evidence to

9    back up that they are ongoing contributors to

10   the standards process, I can provide their

11   submissions made that are signed and these are

12   on behalf of TQ Delta.

13                   THE COURT:  I guess what I would

14   appreciate understanding is why their ongoing

15   efforts would be subject to discovery?

16                   MR. McANDREWS:  Why would it be

17   subject for discovery?

18                   THE COURT:  Right.

19                   MR. McANDREWS:  Potentially for

20   several reasons.  One is that their current

21   development work may lead to improvements to the

22   very technologies in the case.  And so a

23   discovery request is broad enough to encompass

24   development work that led to the inventions of

```
 1        the patent-in-suit and would be broad enough to
 2        encompass some of the work they're doing now.
 3                    THE COURT:  How long were these
 4        patents-in-suit sought?
 5                    MR. McANDREWS:  Filed in the first
 6        instance, some of them very recently, as
 7        recently as 2009.  In fact, there have been new
 8        patent filings now that Marcos and Michael Zanos
 9        are with TQ Delta.  So there have been brand new
10        patent filings made in the name of TQ Delta, and
11        those are not in the case, Your Honor.  But let
12        me give you an example --
13                    THE COURT:  Okay.  So what I've
14        heard you say is they might ask for something
15        related to the development of technology
16        relating to these patents.  But what I'm
17        wondering is why is what they're doing today
18        relevant?
19                    MR. McANDREWS:  Well, let me take
20        on general relevance, not necessarily in the
21        sense is it discoverable.  It's only
22        discoverable if they ask for it.  And it sounded
23        to me like their position was if they don't ask
24        for it, then it's not relevant.  We may want to
```

1     affirmatively rely on the fact that TQ Delta is

2     an ongoing inventive entity and not

3     pejoratively referred to as an MPE.

4                    THE COURT:  Well, we're not going

5     to have pejorative references when the rubber

6     hits the road so you don't need to prove that

7     you're not something that they're not going to

8     be allowed to call you in the first place.

9                    MR. McANDREWS:  Your Honor, I

10    understand that, but there are shades of grey of

11    what they're allowed to call us.  There's a

12    recent decision of Judge Lucy Koh out in

13    California where they said you can't call them

14    an MPE, you can't call them a troll.  However,

15    you can tell the jury that they do not continue

16    to contribute anything, that they are merely a

17    patent-holding company.  So while you're not

18    allowed to call them names, you're allowed to

19    list the facts.

20                   And if they're allowed to list the

21    facts of we don't continue to contribute to

22    anything, we merely bought a patent portfolio

23    and we make our money off of suing people, we

24    should have the ability and we may want to

1    introduce the jury to the company, the ability

2    to tell them about their ongoing inventive work.

3             THE COURT:  Well, this kind of

4    dispute was raised a few weeks ago in a

5    different case.  And what I said was essentially

6    you can talk at a high level about what you do

7    but the details don't matter because we're not

8    going to have a trial where Mr. Zanos gets up

9    and says, yeah, I continue to invent things and

10   he gets cross-examined with here is your source

11   code, it's not very inventive.

12             I guess what I'm wondering is it

13   seems like we're arguing over this prosecution

14   bar to at least right now your leading argument

15   seems to me incredibly tangential in the first

16   place, which is the reason why I was asking you

17   why is it relevant.  Because typically one of

18   the reasons why you have a one-way bar is

19   because they're the accused infringers and

20   you're looking for when you cut off what they're

21   doing so we can get a case to trial so you're

22   looking for what they're doing right now.

23             At least it seems to me generally

24   as a matter of the core questions of the

```
 1        infringement and invalidity, what you're doing
 2        right now makes no difference.
 3                    MR. McANDREWS:  Let me set aside
 4        what we're doing now just for the moment and
 5        talk about the documents that will show a
 6        conception and reduction to practice or work on
 7        the things that were leading to the products at
 8        the time where it was an ongoing entity.  There
 9        will be information there that remains
10        confidential.  In fact, currently some of that
11        information will be owned by Lantic, a third
12        party.
13                    That information that remains
14        confidential is intellectual property that might
15        ultimately wind up in a commercial product of
16        someone, maybe not ours, maybe ours in the
17        future, but there's no reason why their
18        attorneys and their expert witnesses that have
19        access to that type of information, there's no
20        reason to distinguish my access to their
21        information, from their access to my information
22        because they can use it for the same reason.
23                    All of the reasons that they're
24        concerned about that I would run out and write a
```

1    claim -- and by the way, we're not asking to not

2    have a prosecution bar apply to us.  We're

3    asking for their prosecution be defined in a way

4    such that I can participate in an IPR for them

5    as long as I'm not allowed to draft claims.  We

6    have no problem with that.

7              The problem we have is that it's a

8    unilateral thing that impacts the ability of TQ

9    Delta to manage this case economically versus

10   what they have to deal with.  Let me use a

11   specific example.  2wire has proposed -- and the

12   reason this dispute arose is originally the

13   parties appeared to be in agreement on a two-way

14   prosecution bar.  The only reason we got to the

15   point of them insisting on a unilateral

16   prosecution bar is 2wire proposed an expert

17   witness.  Her name is --

18              THE COURT:  Ms. Jacobson.

19              MR. McANDREWS:  -- Kris Jacobson,

20   that's correct.  She has a Ph.D. in DSL.  She

21   used to participate at the same tables and in

22   the same rooms as Marcos and Michael Zanos at

23   the ITU on behalf of 2wire, so she's a

24   participant in the industry and she could turn

1      around and go back to that.  But currently her

2      job is a patent attorney.  And I would imagine

3      with her expertise in DSL that's what she does

4      in large part in her private practice.  She

5      prosecutes DSL applications.

6                  So the reason we're here is

7      Defendants desperately want to use this expert.

8      We said, well, are you sure that she's going to

9      be compliant?  We see that her current job is a

10     patent attorney.  Are you sure she's willing to

11     comply with the prosecution bar, and that's when

12     we got the letter back saying, you are an MPE.

13     We don't agree to that.

14                  So I guess I will use fairness,

15     Your Honor.  There is nothing to distinguish the

16     information that they will be receiving from us

17     and we will be receiving from them in the sense

18     of why a prosecution bar ought to apply.  If

19     they get access to our information, they can

20     write claims that will read on people that use

21     our intellectual property.  They will write

22     claims that may read on things that we

23     contribute to the ITU.  If we are going to be

24     contributing information to the ITU and it

1    becomes part of the standard, then it will

2    necessarily be used by third parties.

3                    The other thing that they can do

4    is if we have a new technology, now I'm back in

5    the new technology area, because the United

6    States is now a first-to-file country or regime

7    rather than first-to-invent, they can actually

8    destroy our inventive rights by filing first.

9                    THE COURT:  This is all assuming

10   that they violate the confidentiality order,

11   right?

12                   MR. McANDREWS:  I agree, Your

13   Honor, that's true.  But the same presumption is

14   made against me, and that's the reason it's a

15   prosecution bar to insulate that and make sure

16   to put some security in place to make sure that

17   it does not inadvertently happen.

18                   THE COURT:  Mr. Connolly, are you

19   speaking on behalf of the --

20                   MR. CONNOLLY:  I'm going to speak

21   on behalf of my client, Your Honor.  And first

22   of all, I need to apologize.  In preparing for

23   this, I didn't realize that we had not enclosed

24   as exhibits the three documents referenced in

```
 1      our letter.  The most important one is --
 2                    THE COURT:  I'm sorry.  You --
 3                    MR. CONNOLLY:  We cited your
 4      decision, your oral decision in Ventronics --
 5                    THE COURT:  I remember that.
 6                    MR. CONNOLLY:  I assume you would
 7      remember that.
 8                    THE COURT:  No, actually that's a
 9      bad assumption to make, but that was in the
10      first month I was a judge so I do remember some
11      of those things.
12                    MR. CONNOLLY:  That's a good one
13      to remember, Your Honor.  Let me concentrate on
14      Ventronics.  Because what you said there was
15      that what's -- after Deutsche Bank, what's good
16      for the goose is no longer good for the gander.
17      The whole point of a prosecution bar is to
18      ensure that a party doesn't suffer a competitive
19      disadvantage created by an inadvertent
20      disclosure.  We're not competitors.  There are
21      no products that they are producing.
22                    I'm having a hard time frankly
23      understanding exactly what the nature of the
24      information is that they are concerned about
```

 1          disclosing to us.  But the bottom line is they

 2          don't have products where we would take that

 3          information that they give us and rewrite or

 4          prosecute patents that we would then go and

 5          assert against them.  So the whole concern that

 6          was addressed by Deutsche Bank, and that is the

 7          motivation and reason behind a prosecution bar

 8          just isn't at play here.

 9                    As far as the possibility that we

10          could destroy their inventor rights by rushing

11          to file, you've got to swear under oath an

12          inventor declaration.  We're not going to commit

13          fraud at The Patent Office.  There are

14          mechanisms in place to address that type of

15          egregious conduct.  We're talking trade secret

16          theft, all sorts of things.  That's not what the

17          prosecution bars were meant to address.

18                    They're meant to address what The

19          Federal Circuit called inadvertent compromises.

20          The idea that the folks that are prosecuting the

21          patents inadvertently are using that information

22          they were given such that your typical

23          confidentiality order in place in a case isn't

24          sufficient.  We have to extend it to the

1    prosecution realm and have these prosecution

2    bars.

3              The burden under Deutsche Bank is

4    on the party who seeks the prosecution bar.  I

5    have not heard anything that would justify that

6    kind of bar.  What I have heard and I think the

7    most telling phrase that Mr. McAndrews used is

8    the fact that he's concerned that there's not a

9    fairness because it would impact his ability to

10   manage the case.  And what's really going on

11   here, Your Honor, is TQ Delta does not want us

12   to take advantage of the services that

13   Ms. Jacobson is offering and has offered in the

14   past as an important consultant to Pace and

15   2wire, but that tactical litigation desire is

16   not sufficient to ask the Court to impose a

17   prosecution bar.

18              Somebody like Ms. Jacobson is just

19   not willing to endure a two-year prohibition

20   on --

21              THE COURT:  What is it that she

22   does?  I gather she was an associate of

23   Covington & Burling.  Apparently, she has a

24   Ph.D. in some relevant field and is an expert in

1     DSL.  Is she now essentially a full-time

2     consultant?

3              MR. CONNOLLY:  My understanding is

4     she's a consultant/lawyer.  I don't know if I

5     can speak to anything more specific to that.

6     She did --

7              THE COURT:  What I'm wondering is,

8     is part of what she does patent prosecution?

9              MR. CONNOLLY:  Yes.  I couldn't

10    represent to the Court to the extent to which it

11    is.  So there's no question that she's involved

12    in patent prosecution.  But I think the issue is

13    if she is provided information in this case

14    could she use that information to the

15    competitive disadvantage of TQ Delta.  That's

16    what the core of Deutsche Bank is all about.

17             THE COURT:  Mr. McAndrews, what

18    you were saying is that part of the documents

19    that might be produced had to do with

20    essentially inventor information that predates

21    the filing of the patents.  You mentioned

22    conception and reduction to practice and that

23    this would be information that I guess was not

24    reflected in the patents?

```
 1              MR. McANDREWS:  Correct.  But I'm

 2    not suggesting that it's information relevant to

 3    the patents-in-suit necessarily.  It could be an

 4    additional invention that might ultimately lead

 5    to a new patent application to be filed.  The

 6    problem we would face on the concept of burden

 7    is their primary response was, well, that

 8    information isn't relevant.  And so if we don't

 9    get it, there's no reason for a prosecution bar.

10    That places an immense burden on us to attempt

11    to filter documentation.

12              If I've got a lab notebook and

13    it's got on 30 of the pages information relevant

14    to the case but interspersed in there and I've

15    got information that they say is not relevant,

16    I've got an immense burden to separate that.

17    And I will hear of course, you can't redact

18    pages.  How do we know it's not relevant to the

19    case.

20              THE COURT:  Maybe that's what I

21    think Mr. Connolly was talking about.  One place

22    where you're different is they don't have any

23    choice but to provide their highly confidential

24    attorneys eyes only information because it has
```

1      to be produced for the case.  What you're

2      saying, and I'm perhaps exaggerating here a bit,

3      but it seems what both you and Mr. Connolly said

4      was that essentially you are talking about

5      information that doesn't have to be produced for

6      the case, but it would be a lot more convenient

7      and maybe even transparent to just produce it

8      and let them figure out which is relevant and

9      not relevant to the case.  Is that a fair

10     characterization?

11                    MR. McANDREWS:  Yes.

12                    THE COURT:  All right.  Do you

13     have anything else you want to say?

14                    MR. McANDREWS:  I know I haven't

15     been clear on this point so they want to make

16     the distinction between products.  On the one

17     hand, they don't want me to inadvertent -- well,

18     not me because I'm not going to be writing

19     claims but someone that would inadvertently

20     write claims that read out a product and I've

21     learned about -- let's say it was going to be

22     me.  And --

23                    THE COURT:  Right, that's

24     inadvertent.  You see something.  It's in the

1    back of your mind and then you're busy writing

2    some claims and it comes from the back of your

3    mind to the front of your mind and you forgot

4    how it got into the back of your mind.

5                    MR. McANDREWS:  Correct.  And I

6    agree that's one of the issues that courts look

7    at when they're considering a prosecution bar.

8    The same consideration applies to TQ Delta.

9    Granted it's not brick and mortar, metal box

10   with chips in it.  But when you're contributing

11   ideas to a standard, the standard will not

12   accept your ideas.  If there was intellectual

13   property out there, patents out there, that are

14   not FRAND obligated, so if it's going to become

15   part of the standard, they want you to check the

16   right boxes that say we agreed to license on

17   fair nondiscriminatory terms.

18                    If that information should

19   inadvertently find its way into Ms. X -- we

20   don't have to worry about Ms. Jacobson

21   necessarily, but Mr. And Mrs. X Patent Attorney,

22   if it should make its way into their patent

23   application and the patent application gets

24   filed on behalf of yet a third party that

```
1       doesn't have an obligation to license on FRAND

2       terms, that can cause real harm to the ITU

3       process, to the standardization process.

4                    So while there is not the

5       identical concern of writing a claim on a

6       product, there is a competitive harm that

7       occurs.  Maybe it's not a competitive harm to

8       us.  I mentioned earlier that maybe it's the

9       Lantic information that gets disclosed, but it's

10      the same consideration.

11                   If they have attorneys or

12      witnesses with access to the confidential

13      information in this case, there is a chance that

14      that information could be inadvertently be used

15      in a patent application to the harm of TQ Delta

16      but also to the industry in general.  The ITU is

17      set up so that those contributing to

18      intellectual property are obligated to license.

19                   THE COURT:  All right.  Anything

20      else from you, Mr. Connolly?

21                   MR. CONNOLLY:  I guess I'm a

22      little befuddled by that.  If a contribution was

23      made to the ITU and we took that information and

24      went to the PTO with it, I don't think that
```

1    that's a realistic risk that anybody would take

2    and I think there's mechanisms to deal with it

3    and I think, obviously, if that information has

4    already been disclosed, you don't have a patent

5    to begin with.  So I don't really understand the

6    example.

7                    I think at the end of the day

8    where we are we have not heard anything

9    sufficient to establish the burden that there's

10   a risk that some inadvertent disclosure is going

11   to create a competitive disadvantage.  And then

12   on top of it even if we did establish that, you

13   would have to balance it against the harm that's

14   posed to us which is significant because we're

15   not going to have the consultant that we've

16   chosen, and that's what gave rise to this

17   concern.

18                    THE COURT:  I will take a recess

19   for a minute.  I will be right back.

20                    (Brief recess.)

21                    THE COURT:  So I think the burden

22   is on the Plaintiff here and I think the

23   Plaintiff hasn't met the burden.  And I say that

24   partly because I really do think it's in

1      Plaintiff's control whether any of the

2      information they provide could cause a person

3      who has it, who's involved in patent prosecution

4      activities to inadvertently disclose it, I think

5      it's under their control.

6                    And I'm not persuaded that there's

7      any reason to be disclosing the sorts of things

8      that would trigger the need for a bar of the

9      Defendants' attorneys and in particular their

10     consultant, so I'm going to not order it.  All

11     right.  Sorry for the delay here.  Okay?

12                    MR. FARNAN:  Thank you, Your

13     Honor.

14                    MR. McANDREWS:  Thank you, Your

15     Honor.

16                    MR. CONNOLLY:  Thank you, Your

17     Honor.

18                    (The proceedings ended at

19     4:40 p.m.)

20

21

22

23

24

1        C E R T I F I C A T I O N

2

3              I, Taneha Carroll, Professional

Court Reporter, certify that the foregoing is a

4

true and accurate transcript of the foregoing

5

proceeding.

6

7              I further certify that I am neither

8    attorney nor counsel for, nor related to nor

9    employed by any of the parties to the action in

10   which this proceeding was taken; further, that I am

11   not a relative or employee of any attorney or

12   counsel employed in this case, nor am I financially

13   interested in this action.

14

15

16        /s/Taneha Carroll
          Taneha Carroll

17

          Professional Reporter and Notary Public

18

19

20

21

22

23

24

# EXHIBIT C

1             IN THE UNITED STATES DISTRICT COURT

2             IN AND FOR THE DISTRICT OF DELAWARE

3
    TQ DELTA, LLC,                  :   CIVIL ACTION
4                                   :
                    Plaintiff,      :
5                                   :
        vs.                         :
6                                   :
    COMCAST CORPORATION, et         :
7   al.,                            :
                                    :
8                   Defendants.     :   NO. 15-611 (RGA)
    ---------------------------     :
9   TQ DELTA, LLC,                  :   CIVIL ACTION
                                    :
10              Plaintiff,          :
                                    :
11      vs.                         :
                                    :
12  COXCOM, LLC, et al.,            :
                                    :
13                  Defendants.     :   NO. 15-612 (RGA)
    ---------------------------     :
14  TQ DELTA, LLC,                  :   CIVIL ACTION
                                    :
15                  Plaintiff,      :
                                    :
16      vs.                         :
                                    :
17  DIRECTV, et al.,                :
                                    :
18                  Defendant.      :   NO. 15-613 (RGA)

19                              - - -

20
                            Wilmington, Delaware
21                          Tuesday, October 20, 2015
                            10:43 o'clock, a.m.
22
                                - - -
23
    BEFORE:  HONORABLE RICHARD G. ANDREWS, U.S.D.C.J.
24

25                              Valerie J. Gunning
                            Official Court Reporter

```
1    TQ DELTA, LLC,              :   CIVIL ACTION
                                 :
2              Plaintiff,        :
                                 :
3    vs.                         :
                                 :
4    DISH Network Corporation,   :
     et al.,                     :
5              Defendant.        :   NO. 15-614 (RGA)
6
7                   - - -
8
```

```
1    APPEARANCES:
2
3         FARNAN LLP
          BY:  MICHAEL J. FARNAN, ESQ.
4
5              -and-
6         McANDREWS, HELD & MALLOY, LTD.
            BY:  PETER J. McANDREWS, ESQ.
7          (Chicago, Illinois)
8
               Counsel for Plaintiff
9                TQ Delta
10
11        MORRIS, NICHOLS, ARSHT & TUNNELL LLP
          BY:  JACK B. BLUMENFELD, ESQ. and
12             JENNIFER YING, ESQ.
13
               Counsel for Defendants
14             Comcast Corporation and Comcast Cable
          Communications LLC, Coxcom LLC, Cox Media
15        LLC, Cox Communications Inc., and Cox
          Enterprises, Time Warner Cable Inc. and
16        Time Warner Cable Enterprises LLC, DirecTV
          and DISH Network Corporation
17
18
          DUANE MORRIS LLP
19        BY:  L. NORWOOD JAMESON, ESQ. (via telephone)
             MATTHEW C. GAUDET, ESQ. (via telephone)
20           COREY MANLEY, ESQ. (via telephone)
             NORWOOD JAMES, ESQ. (via telephone)
21
22             Counsel for Defendants
          Comcast, Cox, TWC and Verizon
23
24
25
```

```
1    APPEARANCES (Continued):
2
3         ROSS ARONSTAM & MORITZ LLP
          BY:  BENJAMIN SCHLADWEILER, ESQ.
4
5
               Counsel for Defendant
6                Verizon
7
8         ORRICK, HERRINGTON & SUTCLIFFE LLP
          BY:  ALEX V. CHACHKES, ESQ
9           (New York, New York)
10
               Counsel for Defendant
11               DirecTV
12
13        COOLEY LLP.
          BY:  STEPHEN SMITH, ESQ.
14
15             Counsel for DISH Network Corporation.
16
                   - - -
17
18
19
20
21
22
23
24
25
```

```
1              P R O C E E D I N G S
2
3         (Proceedings commenced in chambers, beginning at
4    10:43 a.m.)
5
6         THE COURT:  All right.  Please be seated.
7         And there's the scheduling conference in TQ
8    Delta versus Comcast Cable Communications, No. 15-611 plus
9    five other cases that are the next sequentially numbered
10   cases.
11        And why don't we hear who is here and who you
12   represent.  Mr. Farnan?
13        MR. FARNAN:  Good morning, your Honor.
14   Michael Farnan on behalf of the plaintiff, and with me is
15   Peter McAndrews from McAndrews, Held & Malloy.
16        THE COURT:  All right.
17        MR. McANDREWS:  Good morning, you Honor.
18        THE COURT:  And for defendants?
19        MR. BLUMENFELD:  Good morning, your Honor.
20   Jack Blumenfeld.  And I'm here with my colleague,
21   Jennifer Ying.  We're here for all of the defendants except
22   Verizon.
23        Alex Chachkes from Orrick is next to me, and
24   he's here for Direct TV.  Next to him is Corey Manley, who
25   is here for Comcast, Cox, Time Warner and Verizon.  And on
```

1 the phone are his colleagues, Norwood Jameson and Matt
2 Gaudet. And at the end of the table, Steve Smith from
3 Cooley, who is here for DISH.
4          THE COURT: All right. And Mr. Schladweiler,
5 you're here all alone?
6          MR. SCHLADWEILER: I'm here for Verizon, your
7 Honor, along with Mr. Manley and the Duane Morris folks that
8 are on the line.
9          THE COURT: Oh, okay. All right.
10          All right. So I looked through, and you seem to
11 have resolved most of the issues that are sometimes raised,
12 so what I thought was we'd fill in the dates and then we can
13 resolve the other issues.
14          So for the trial, I was thinking of scheduling
15 this for a five-day jury trial beginning on November 13th of
16 2017. Are your calendars free then? All right.
17          MR. BLUMENFELD: Your Honor, we do have, I don't
18 know if you -- we do have a disagreement among the parties
19 as to whether, you know, these are six cases.
20          THE COURT: They're six cases.
21          MR. BLUMENFELD: One trial or six trials.
22          THE COURT: Six trials, not even close. But I
23 figured there's a trial scheduling conference in here
24 somewhere. Right?
25          MR. BLUMENFELD: Right. Paragraph 20.

1          THE COURT: All right. So we'll figure it out.
2 I took it what we do is figure out the other five at that
3 time.
4          When is the trial -- well, I guess I know the
5 answer to that question and you don't.
6          MR. BLUMENFELD: We propose August.
7          THE COURT: So I guess what I'm wondering is, if
8 we have the -- oh, yes. If we have that in August and the
9 trial is in November, is this something where we can
10 basically say, one of the six defendants will be on tap for
11 November 13th, maybe not all defendants will still be left,
12 but at least one, and we'll select the one in August?
13          MR. BLUMENFELD: That's fine with us, your
14 Honor.
15          THE COURT: Fine with you, Mr. McAndrews?
16          MR. McANDREWS: Yes, your Honor.
17          THE COURT: Okay. All right. So the date I had
18 in mind for the August conference was August 18th of 2017,
19 at 9:00 a.m. And for whoever the lucky first one is, their
20 pretrial conference would be on October 27, 2017, at
21 9:00 a.m.
22          In paragraph 18, where it says, the Court will
23 hear argument on case dispositive and Daubert motions, I'm
24 not going to give you a date for that for two reasons. One,
25 maybe I will and maybe I won't hear argument, but more

1 seriously, whether -- I'm not going to reserve time, you
2 know, for argument two years from now. If we're going to
3 have argument, we will decide that, you know, when I know
4 what other stuff I have scheduled and can fit it in
5 someplace. All right? So I would suggest that you probably
6 just delete that paragraph for the time being.
7          So the hearing on claim construction, how about
8 October 19th of 2016, at 9:00 a.m.?
9          Is that all the dates?
10          MR. BLUMENFELD: I believe that is, your Honor.
11          MR. McANDREWS: Yes, your Honor.
12          THE COURT: All right. Mr. McAndrews, is the
13 full lineup of 32 patents asserted against all of these
14 people?
15          MR. McANDREWS: No, your Honor. There are --
16 this is a far smaller, more manageable case. There are
17 eight total patents asserted that represent three patent
18 families. I believe two of the patent families -- well, one
19 patent family has patents that, has three patents that are
20 also in the DSL case. I don't believe there are any other
21 patents in the case here that are in the DSL case.
22          THE COURT: Okay.
23          MR. BLUMENFELD: I'm not sure that's right,
24 your Honor. I thought that most or all of the patents here
25 were also in the DSL litigation, but others may know that

1 better.
2          MR. MANLEY: I believe there are five patents
3 that overlap in some way with all of the other prior cases.
4          THE COURT: All right. Well, three or five?
5          MR. McANDREWS: There's some overlap, your
6 Honor.
7          THE COURT: Okay.
8          MR. McANDREWS: But it's not overlap, and
9 there's far fewer.
10          THE COURT: All right. So in terms of the other
11 disputes that are in here, paragraph 2, I'm not entirely
12 sure what the point of the dispute here is.
13          MR. BLUMENFELD: Your Honor, the dispute here,
14 it's not a big dispute, is that under the default standard,
15 and this just goes to the paragraph 5, the ESI provision,
16 the electronic discovery provision, we wanted -- now, these
17 cases tend not to be proportional between the plaintiff and
18 the defendants.
19          We wanted to discuss the scope and schedule of
20 electronic discovery, and I think the default standard
21 contemplates that the parties will discuss it and try to
22 resolve it. We have not had an opportunity to do that. The
23 plaintiff just wants to impose the default standard. We
24 would at least like to try to work something out that may be
25 better suited to these cases, and if we can't work it out,

1 either come to your Honor or the default standard I suppose
2 will apply. But I think we would at least like to make an
3 effort to try to reach some agreement, which is probably
4 less onerous on the defendants.
5       MR. McANDREWS: So he's correct, that there's
6 not a significant debate here. The concern we had though is
7 that we didn't want this to be used as a reason to delay the
8 early disclosures, such as core technical documents, and so
9 we wanted the default standard in place, and if they have a
10 problem with it, I mean, it is a default standard for that
11 reason. It goes into place unless somebody has good cause
12 to change it.
13       THE COURT: The thing that you're concerned
14 about on the proportional discovery, Mr. Blumenfeld, is that
15 sort of e-mail, that sort of thing?
16       MR. BLUMENFELD: That sort of thing. I don't
17 think it will affect core technical documents. I mean,
18 we've agreed to dates for the 4(a), (b), (c) disclosures.
19       THE COURT: All right. So let's do this. I'm
20 going to go with plaintiff's language, because although I
21 don't think necessarily this is a uniform view, it is a
22 default standard. You have not worked something out. That
23 being said, I think it's entirely reasonable for this thing,
24 which is -- well, actually, I was saying it's based on the
25 DSL litigation. Maybe it's not.

1       But it's perfectly appropriate for the parties
2 to meet and confer about e-mail and such, and I expect they
3 will, and if they work out something, that's fine. If they
4 don't work out something, and, you know, there's a dispute
5 resolution procedure.
6       So I don't really think I'm deciding a whole lot
7 here because even though I'm going to go with plaintiff's
8 language, I think the thing that defendants are interested
9 in are still things they have a chance to talk to plaintiff
10 about and see if they can't come up with some variance from
11 the default standard that's more suitable for the case,
12 because I think Mr. McAndrews is right, that's what the
13 default standard is for, but I also think that it's not a
14 weapon and the parties should try to work out what's best
15 for this case.
16       All right. Paragraph 6. Defendants wanted to
17 add, plaintiffs shall also identify the claims that are
18 allegedly infringed.
19       Do you not know which claims are allegedly
20 infringed?
21       MR. McANDREWS: Your Honor, I think it would be
22 fair to say we don't know the full scope of what's
23 infringed. In order to satisfy Rule 11, we need to have at
24 least one claim of each of the asserted patents where we
25 know that we've got an infringement case.

1       We don't have the full scope, and I think that
2 paragraph 6(a), it's similar to the issues that we're going
3 to face in (c), and then in paragraph 7, where the
4 defendants want to force an early narrowing of the number of
5 asserted claims. And I just, I think it's premature,
6 particularly at the identification of accused products stage
7 to be -- you know, they're going to get our asserted claims
8 when they get our initial infringement charts, so I can go
9 onto the other items.
10       I really just think it's a matter of, it would
11 be premature to force us to reduce the number of claims.
12 Again, this is not a case like the other case. There's not
13 32 patents. There are eight patents. The patents generally
14 have a standard claim set, meaning, you know, approximately
15 three or four independent claims and, you know, between 10
16 and 30 total claims. This really isn't an unusually large
17 patent case, and so we think that the default standard is
18 perfectly applicable to this size case.
19       THE COURT: Mr. Blumenfeld?
20       MR. BLUMENFELD: And, your Honor, the reason we
21 were doing this is, as e said, there are eight patents,
22 three families. There are 152 claims in those eight
23 patents. I don't know exactly what is happening in the DSL
24 case.
25       THE COURT: Neither do I.

1       MR. BLUMENFELD: But that there are, you know,
2 that the parties have 64 claims there and it has become
3 somewhat unmanageable. We'd like to at least get things
4 narrowed down so we don't have to deal with 152 claims from
5 the outset. And --
6       THE COURT: But the outset is December 18th,
7 2015, and paragraph C is March 4th of 2016. Presumably --
8 so you are going to know what plaintiff is asserting on
9 March 4th of 2016.
10       MR. BLUMENFELD: Right. And we can probably
11 live with that as long as it's a reasonable number. What we
12 don't want to find out is that in March, we have 120 claims
13 or we have 100 claims.
14       THE COURT: All right. So here's what I'm going
15 to do. In paragraph 6(a), I'm going to delete defendants'
16 language because I tend to think that Mr. McAndrews is
17 right, they don't have to have every claim they want to
18 assert worked out quite that quickly.
19       But as you know, Mr. McAndrews, I do like to get
20 some narrowing. What is the most number of claims that you
21 think you might reasonably assert on March 4th of 2016?
22       MR. McANDREWS: I think maximum, 60. I expect
23 that it won't be that many, but let me just present one of
24 the issues that we may run into.
25       So similar to DSL, you have two ends of the

1 communication line. In some cases, that communications is
2 not symmetrical, meaning everything that happens on one end
3 may not happen on the other.
4     Now, it's not as simple as the way to think of
5 it in the DSL case, where you have a central office that is
6 the AT&T hub, and somebody is home.
7     THE COURT: Don't compare it to the DSL case
8 because they're not involved in it and I don't understand
9 it, so that's not really helping you.
10     MR. McANDREWS: Right. But so the DSL case, the
11 two ends of the communication line. One is out at some
12 bunker in here and the other one is in your home or in your
13 office.
14     In MoCA, both lines of the communication are in
15 your home, so there's going to be more, it's going to be
16 more symmetrical in some sense because you're in the same
17 environment, but there may be some non-symmetrical portions,
18 and therefore a claim may have been written to read on only
19 one end. And then so in that case, if I have a claim that
20 reads on the far end and a claim that reads on the near end,
21 I'm going to need to assert both of those.
22     So I can't, I can't say for certain how many
23 claims I need. It may not be adequate to have one
24 independent claim per patent. I may need multiple
25 independent claims per patent. And so I think I would be

1 happy to take a limit of 60 right now. I do anticipate that
2 it's going to be less than that. I have no interest in
3 expanding the case beyond what it needs to be.
4     THE COURT: All right. Thanks.
5     All right. So I'm going to say that you can't
6 assert more than 60. I know it's not the 40 that you are
7 asking for, Mr. Blumenfeld, but I think it's a reasonable
8 start. And I'm not going to limit them to so many claims
9 per patent. I'm just going to say no more than 60 asserted
10 claims on March 4th.
11     All right. So then that moves us on to
12 paragraph 7, which talks about further reduction in claims,
13 and both before and after the claim construction order.
14     And as you probably know, Mr. McAndrews, I like
15 to see the number of claims reduced, and those are
16 reasonable points for some reduction.
17     What is your thought about that?
18     MR. McANDREWS: So I think these numbers are too
19 low. There -- of course, we have no objection to making the
20 case as manageable as we can for the Court going into claim
21 construction. If you want to set some numbers here and then
22 put the burden on me to explain to you why I think I need
23 more, I'm okay with that. I just think that these numbers
24 just in an absolute sense are far too small.
25     THE COURT: So what about if we say for

1 May 13th, 2016, the preliminary election is no more than 40
2 claims? And if it turns out that that prejudices you in
3 some significant fashion, then you can show some good cause
4 and I will let you add more. That's what you are talking
5 about. Right?
6     MR. McANDREWS: Correct, your Honor.
7     THE COURT: All right. So 40 claims as of
8 May 13th, 2016, and, again, I'm not going to spread them out
9 over the patents.
10     And so after the claim construction order, we'll
11 aim for 20 claims. And, again, if it turns out that that is
12 prejudicing you in some fashion, Mr. McAndrews, you can
13 bring it to my attention, and show me some good cause to
14 give you more than 20. Okay?
15     MR. McANDREWS: Okay, your Honor. So that is
16 two-and-a-half on average. Okay.
17     THE COURT: All right.
18     MR. McANDREWS: Okay.
19     THE COURT: I mean --
20     MR. McANDREWS: All right. As long as I have
21 the ability to beg for more.
22     THE COURT: Yes. I don't like to think of it as
23 begging.
24     MR. McANDREWS: Your Honor, so before we move
25 on, this is not something that was addressed in our -- and I

1 apologize, we didn't address this. But it looks like we
2 have just over three weeks in order to narrow after the
3 prior art, invalidity defenses are presented for the first
4 time.
5     THE COURT: Do you want more time?
6     MR. McANDREWS: Well, I think that would force
7 the claim construction to slide, and I prefer not -- I think
8 what I might suggest is some sort of limitation on the
9 number of prior art references that are going to be
10 asserted.
11     THE COURT: Well, I have no problem doing that,
12 too, but that's not actually in here at all right now.
13 Right?
14     MR. McANDREWS: That's correct, your Honor.
15     THE COURT: So you were going to say?
16     MR. BLUMENFELD: I mean, there will be a time in
17 the case when we do that, but the problem we have is,
18 without knowing what the 60 claims are, it makes it kind of
19 hard to know that.
20     THE COURT: No. That's the reason why your
21 narrowing always occurs after their narrowing.
22     MR. BLUMENFELD: Right.
23     THE COURT: So what I suggest is this. As I'm
24 sure everybody in the room knows, not exactly in this
25 particular case, I tend to look at the, what I call the

1 Federal Circuit Advisory Committee Model Order, which, of
2 course, was never adopted, so I'm not bound by it.  But in
3 terms of the ratio of how many prior arts there should be
4 relative to the number of asserted claims, why don't you all
5 see if you can't agree to something between yourselves,
6 understanding that if you bring a dispute to me, I'm
7 probably going to go look at that to figure out where I'm
8 going to come out.
9            MR. BLUMENFELD:  That's fine.
10           THE COURT:  And then you can either memorialize
11 it in a stipulation, or you can memorialize it between
12 yourselves, but essentially, at some reasonable time,
13 relatively soon after plaintiff limit the number of asserted
14 claims, defendant limit the number of asserted prior art.
15 Okay?
16           MR. BLUMENFELD:  That's fine.
17           MR. McANDREWS:  Thank you, your Honor.
18           MR. BLUMENFELD:  Yes.
19           THE COURT:  All right.  And I think there is one
20 other thing here, which is about the 30(b)(6) depositions,
21 and defendants have added this.
22           And I take it this is designed to protect
23 defendants' witnesses, not plaintiff's, what I presume
24 are a fairly limited number of witnesses based on what I've
25 heard.

1            Is that what defendants are trying to do here?
2            MR. BLUMENFELD:  That is what we're trying to
3 do.  And the problem is that, it does tend to be on the
4 defense side in these cases, that you get serial 30(b)(6)
5 notices.  You get one, that's completed.  You get another
6 one, overlapping topics, and we are just trying to avoid
7 that.
8            THE COURT:  Well, so here's the thing.  You
9 know, this is essentially adding, the parties will endeavor
10 to be reasonable.  Right?  I mean, that is what you are
11 asking to add in here.  That's implicit to me, and it is
12 very hard -- you know, it's hard to say anything more than
13 that, which is, in fact, really what you say here, will
14 endeavor not to serve successive notices of deposition to
15 cause witnesses to be deposed multiple times, and
16 presumably, what that means, or an example is, they say, you
17 know, give us your person who is knowledgeable how much you
18 make from selling product A, and so you do that.  And then
19 they do another one that says, give us a person who knows
20 how much you make from selling product B.  You know, that is
21 pretty easy to see, you probably ought to ask all of those
22 at once.
23           So I take it, Mr. McAndrews, you agree with this
24 principle.  Is that right?  You just don't want it in the
25 order?

1            MR. McANDREWS:  I agree with it in principle
2 with one caveat, and that is, it more goes to the topic, as
3 you just mentioned, as opposed to the witness, because it's
4 exclusively under their control the person they designate.
5 And if I ask them about sales and then I ask them about
6 manufacturing and they give me the same guy, that's not my
7 fault.
8            THE COURT:  Right.  Right.
9            MR. McANDREWS:  Right.  But with that caveat,
10 yes, I agree with that.
11           THE COURT:  All right.  So we are agreed,
12 everyone is going to try to be reasonable.  I don't think we
13 need to write it into the order, so I'm going to delete
14 that.
15           In terms of the inventor being -- plaintiff
16 wants the inventor, who I presume is somebody who is
17 affiliated with TQ Delta?
18           MR. McANDREWS:  Not always.  Two are.  The rest
19 are not.
20           THE COURT:  Okay.  In any event, you want them
21 to be consecutive calendar days as opposed to two different
22 occasions?
23           MR. McANDREWS:  Correct, your Honor.
24           THE COURT:  And defendants object to this
25 because?

1            MR. BLUMENFELD:  Your Honor, and we'll try to do
2 that to the extent we can.  The problem is, we have six
3 cases with three lead law firms, and to the extent that
4 people can coordinate schedules, that's great, we'll try to
5 do it, but it is not always possible to coordinate schedules
6 among the witness, the plaintiff's lawyers and three sets of
7 defendants lawyers.
8            THE COURT:  Okay.  So here's what I think.  I'm
9 not going to write this into the schedule either, but I
10 think it's a reasonable request on plaintiff's part.
11           And do we think all of these inventors are in
12 the U.S. somewhere?
13           MR. McANDREWS:  I'm not certain of that.  Some
14 of them may have gone to work for LANtek in Germany.
15           THE COURT:  All right.  But, you know, one of --
16 I'm not saying anything that everyone doesn't know, but the
17 more you plan ahead for these things, the easier it is to
18 make them happen on consecutive days.  And so I don't know
19 when inventors are normally deposed in this, but I would
20 think it's the exception, not the rule, that the plaintiff,
21 or that the inventors are not -- I'm going to get this mixed
22 up on the record.
23           It ought to be the case that the inventor is
24 deposed on consecutive calendar days except for rare
25 exceptions, and I do understand that there are difficulties,

1   but I think it is incumbent on the parties to try to plan
2   ahead for that, so I'm going to not put that in either.
3               Is there anything else?  I don't think there are
4   any other disputed matters in the scheduling order.
5               MR. BLUMENFELD:  No, your Honor.  I think that's
6   everything.
7               THE COURT:  All right.  Is there anything else
8   you want to talk about in connection with this?
9               MR. McANDREWS:  No, your Honor.
10              THE COURT:  Mr. Blumenfeld?
11              MR. BLUMENFELD:  No, your Honor.  Thank you.
12              THE COURT: Mr. Schladweiler?
13              MR. SCHLADWEILER:  No, your Honor.
14              THE COURT:  Okay.  All right.  Well, so,
15  Mr. Blumenfeld, or Ms. Ying, will you resubmit this with the
16  various dates and rulings that I've made?
17              MS. YING:  Yes, your Honor.
18              THE COURT:  Okay.  All right.  Well, thank you.
19  We'll be in recess.
20              (Counsel respond, "Thank you, your Honor.")
21              (Conference concluded at 11:11 a.m.)
22                  - - -
23
24
25

# EXHIBIT D

REDACTED
IN ITS
ENTIRETY

# EXHIBIT E

REDACTED
IN ITS
ENTIRETY

# EXHIBIT F

```
 1              IN THE UNITED STATES DISTRICT COURT

 2              IN AND FOR THE DISTRICT OF DELAWARE

 3                        - - -
    TQ BETA LLC,                    :   CIVIL ACTION
 4                                  :
              Plaintiff,            :
 5  v                               :
                                    :
 6  DISH NETWORK CORPORATION; DISH DBS  :
    CORPORATION; DISH NETWORK L.L.C.;:
 7  ECHOSTAR CORPORATION; ECHOSTAR     :
    TECHNOLOGIES, L.L.C.; HUGHES       :
 8  SATELLITE SYSTEMS CORPORATION;     :
    SLING MEDIA, INC.;                 :
 9                                  :   NO. 14-848-LPS
              Defendants.
10                        - - -

11                  Wilmington, Delaware
                 Thursday, February 4, 2016
12                 Telephone Conference

13                        - - -

14  BEFORE:        HONORABLE LEONARD P. STARK, Chief Judge

15  APPEARANCES:              - - -

16            FARNAN, LLP
              BY:  MICHAEL J. FARNAN, ESQ.
17
                   and
18
              NIX PATTERSON & ROACH, LLP
19            BY:  ROSS LEONOUDAKIS, ESQ., and
                   DEREK T. GILLILAND, ESQ.
20                 (Daingerfield, Texas)

21                   Counsel for Plaintiff

22
              MORRIS NICHOLS ARSHT & TUNNELL, LLP
23            BY:  RODGER D. SMITH, II, ESQ.

24                 and

25                        Brian P. Gaffigan
                          Registered Merit Reporter
```

02:40:26

1     If we could produce particular clauses of the
2  agreements that they would want?  They already have the
3  aggregate amount.  If there was a particular clause
4  regarding fair use or restriction on retransmission of local
5  information that is germane to the case, perhaps we could
6  provide just that in redacted form with the name of the two
7  parties and nothing more.  But I don't think that it would
8  really be -- in other words, it's just for pulling on a
9  thread that will unravel the sweater.  That if you give them
10 one or two or three, then they're going to say, well, we
11 haven't seen all of them.  We don't know what all of them
12 say.  We're happy to consider, for instance, the Fox
13 agreement.  And to the extent there is a clause in there
14 that deals with fair use, we can produce that.  I would
15 recommend that to the client.  But it is, we still have to
16 get Fox's approval.
17     THE COURT:  Okay.  Thank you very much.
18     MR. GUY:  That was.
19     THE COURT:  Thank you.  Let me hear brief
20 rebuttal from TQ.
21     MR. LEONOUDAKIS:  Sure.  Thank you, Your Honor.
22     I think with regard to the aggregate argument,
23 that is kind of a good representation of the production we
24 have gotten so far.  Everything seems to be in the
25 aggregate, but nothing provides us the ability to really

1  dive down to the detail that we need related to the accused
2  technology.  If we have an aggregate content cost, we're not
3  able to tell the amount of that content that is relevant to
4  the Sling technology, how much of that was slung, that sort
5  of example.  I don't think the aggregate cost number really
6  moves the ball forward.
7     With regard to how do we define what is
8  representative, I think because this is relevant to the
9  damages issue, total viewing would be a start.  The three
10 most viewed under those agreements would be a start.
11    It's hard for me to guess about what is typical
12 or what is representative as far as the clauses go because
13 we just simply don't know what is in those.
14    Agreeing to particular clauses I also don't
15 think really gets us moving the ball forward.  So I think
16 having full representative agreements that are the most
17 typical or the most viewed would be a great start.
18    THE COURT:  And what about redacting them?  Do
19 you really need the entirety of those three, for instance?
20    MR. LEONOUDAKIS:  My inclination is that we
21 don't need the entirety.  Like I said, it's hard to say,
22 without knowing what is in there, what is relevant to the
23 damages.  We think we know that the rate retransmission
24 agreements are very relevant, that the price paid for the
25 content is relevant.  There are just simply some clauses in

1  there that I don't know that they exist.
2     THE COURT:  All right.
3     MR. LEONOUDAKIS:  Like I said, though, my
4  inclination is that there is a lot of it that we may not
5  need.
6     THE COURT:  All right.  Thank you.  So my
7  order is, as you might guess, I'm going to order that the
8  plaintiff's motion to compel is granted but only to the
9  limited extent that the defendants are hereby ordered to
10 produce up to -- well, let me not make it up to.  The
11 defendants are ordered to produce three of these carrier
12 agreements, though the defendants may redact portions as
13 they see fit, but in a good faith effort to nonetheless
14 provide the information that the plaintiffs are looking for.
15    Those three that are going to be produced I am
16 ordering to be the three related to the most viewed channels
17 or providers unless the parties can agree on some other
18 mechanism for determining the three that the plaintiff is
19 going to get.
20    If, after reviewing those three or the
21 redactions, the plaintiff thinks that they should get more,
22 then you will have to meet and confer and then ultimately
23 come to me.  But my hope is while I think there may be some
24 or at least for today's purposes is enough limited relevance
25 to the damages issues as articulated by the plaintiffs here,

1  I'm concerned about undue burden on the defendant which
2  is why I have not granted a request for hundreds or more,
3  thousands of documents, and I do want to be mindful of what
4  is proportionate to the value of the case.  And so I'm
5  comfortable that three, the award, the relief I'm ordering
6  here, is relevant and proportional and does not create an
7  undue burden on the defendant.  I'm not at all sure that I
8  could be persuaded to do more and certainly today I cannot
9  be.  So that is my order on the plaintiff's motion to
10 compel.
11    Let's turn to the defendants' motion to compel
12 now, so we'll hear from the defendants first on that.
13    MR. DHANANI:  Good afternoon, Your Honor.  This
14 is Ali Dhanani.
15    The request concerns documents that TQ Beta has
16 redacted on the basis of confidentiality, not on the basis
17 of privilege.
18    So here what we have -- as some background, we
19 initially requested valuations and any information related
20 to how TQ Beta, which is an entity that basically buys
21 patents to assert, has valued those patents and they have
22 confirmed that they do not make any products that are
23 related to the patents.
24    So in our initial request, what we got back was
25 the patent purchase agreement and that is all.  We requested

**1** and asked that if they had any other valuation type of
**2** information? And we got representations saying TQ Beta did
**3** not have any more of those types of information available to
**4** them.
**5** Now, TQ Beta is an entity that is managed by it
**6** appears Techquity Capital Management. What we did is we
**7** issued a subpoena to Techquity Capital Management asking
**8** for similar information, specifically valuation information
**9** related to the patents-in-suit and valuation of information
**10** related to any patent that are owned or co-managed or that
**11** would bear any relevance to this lawsuit.
**12** The document production we received was from TQ
**13** Beta in response to the subpoena, and we're not entirely
**14** clear whether the document production is from TQ Beta or
**15** from Techquity. As we understand it, TQ Beta doesn't have
**16** any separate employees or separate management structure.
**17** They basically have one person they identified in the
**18** initial disclosures which was Ms. Divine who we also deposed
**19** in this case and is the subject of a second half of the
**20** issues here.
**21** But we essentially asked them for that
**22** information; and I believe as recently as about two months
**23** ago, we received some documents right before the deposition
**24** which concerned valuations that were strictly conducted on
**25** patents that were either owned by TQ Beta or were owned by

**1** sister entities of TQ Beta.
**2** Now, we received two versions of these. In one
**3** version, we received an unredacted form of the document which
**4** concerned several valuations that were conducted and in
**5** another we received redacted versions the the of the valuations.
**6** In review of the -- and I'll limit my discussion
**7** to the redacted version that we have here. The redacted
**8** version basically traded the financial analysis that was
**9** conducted to, first of all, evaluating the patent itself,
**10** the types of technologies that the patent may cover, how
**11** the market views noninfringing alternatives and what
**12** noninfringing alternatives are available, and, taking all of
**13** that into account, what a reasonable royalty calculation
**14** would be for those patents and how you would arrive at a
**15** reasonable royalty calculation.
**16** Now, obviously, the other information in that
**17** document was redacted, and this spans tens of pages across
**18** multiple documents.
**19** Now, in addition to the redacted documents,
**20** there appear to be several documents that are also withheld
**21** on the basis of confidentiality. And we just don't know if
**22** there is some -- there is basically gaps in the production.
**23** We can't identify exactly what documents are being withheld
**24** on the basis of confidentiality, and that is because we
**25** certainly don't -- whatever document has been withheld on

**1** that basis is not on their privilege log.
**2** They requested -- just basically, they requested
**3** back the information they produced, and we asked them if
**4** their basis was privilege or confidentiality. They
**5** confirmed that the basis was confidentiality. Subject to
**6** this motion will determine what to do with those documents.
**7** Now, the issue that these go to, Your Honor, is
**8** because TQ Beta is basically a licensing entity and they
**9** don't have very many documents that we have gotten to begin
**10** with, these seem to be the documents that talk about how
**11** the company basically performs its business.
**12** In other words, the business of TQ Beta is to
**13** obtain patents and figure out how to obtain a royalty. And
**14** the information that we're seeking here, it appears to go
**15** to how a calculation of a reasonable royalty would be made,
**16** what type of analysis the company undertakes, what type of
**17** value that company would accept as a fair license to its
**18** patent portfolios, and how the company structures business
**19** to determine how investors are frankly paid back on their
**20** investments which would factor into what they would accept
**21** as a license at the time of the hypothetical negotiation.
**22** And the relevance for this, Your Honor, is that
**23** it shows their business and the value of other patents that
**24** frankly are in the same field. And where I mentioned same
**25** field, it is not just a conjecture because TQ Beta's sister

**1** entity, TQ Delta has already sued DISH in another case.
**2** Now, a few months ago, what they had requested
**3** from us were licenses related to technology or accused
**4** products. For example, our DVR set-top boxes or any other
**5** types of Sling boxes that they have accused in the case.
**6** And one license they specifically fought was the Tivo
**7** license which goes strictly to DVR.
**8** And we objected. The parties negotiated, and
**9** we produced that license because they made several claims
**10** that that was relevant because it concerned an accused
**11** feature here.
**12** Now you have other TQ Beta entities that are
**13** basically asserting their patents against the same accused
**14** products and presumably the same accused technologies, DVR,
**15** whole home DVRs, and they're basically arguing that this
**16** information is no longer relevant. That means licenses that
**17** they themselves -- and reasonable royalty calculations that
**18** they themselves have done as to what they would accept for
**19** patents covering the same technology is now not relevant and
**20** should not be produced in the case.
**21** THE COURT: All right. Mr. Dhanani, we're
**22** starting to run out of time so let me ask you a few questions.
**23** In terms of the documents and the deposition, do
**24** you view the issues as identical or is the deposition
**25** analysis different than the document analysis?

1     MR. DHANANI:  The issue is identical because
2   the information we're seeking from Ms. Divine, and it is a
3   narrow request we have, we're seeking the prices mainly that
4   were paid for the licenses, the type of technology that were
5   available by those portfolios, and the investor information,
6   the investors in those portfolios, the annual.  And so the
7   information we were seeking from Ms. Divine is the same
8   issue as the information that they're seeking to redact here
9   on the basis of confidentiality.
10     THE COURT:  Now, in their letter they say that
11   they have a privilege objection as well I think with respect
12   to the documents as well as the deposition but at least
13   clearly the deposition.  Just respond briefly to the
14   privilege objection and whether in fact they have asserted a
15   privilege objection.
16     MR. DHANANI:  So specifically to the depositions,
17   during the course of the deposition, there were -- and this
18   was confirmed on several passages we highlighted.  We
19   confirmed there was no privilege basis that they were seeking
20   to stop Mr. Lang from answering the questions that they had.
21   And we confirmed from counsel for TQ Beta that they were
22   asserting confidentiality on that basis they were instructing
23   Ms. Divine not to answer.
24     I do see in their letter that they have now
25   identified that they may be subject to a privilege.  That

1   some of that information may be subject to privilege.  And
2   if some of that information is subject to a privilege
3   discussion, then we're not in this letter seeking to make
4   that request to compel on that.  We're seeking the
5   information that they asserted is confidential and can't be
6   produced on that basis.
7     THE COURT:  Okay.  Thank you.
8     MR. DHANANI:  And the privilege also was not
9   present for any reason.  It was not raised in our meet and
10   confer either.
11     THE COURT:  Okay.  Thank you.  Let me hear from
12   TQ, please.
13     MR. GILLILAND:  Your Honor, this is Derek
14   Gilliland from TQ Beta.  Can you hear me okay?
15     THE COURT:  I can, yes.
16     MR. GILLILAND:  Okay.  I'll just respond
17   briefly.  What we have tried to do in this case, Your Honor,
18   is cabin the relevant -- the evidence and the documents to
19   what is relevant.  It is not strictly confidentiality that
20   is at issue in the redacted documents but it is also the
21   relevance to this case, especially when some of these
22   portfolios involve third parties who have no interest in TQ
23   Beta or involve portfolios that TQ Beta, the plaintiff in
24   this case, has no control or interest in.
25     We have produced the information that relates

1   to the valuation of TQ Beta's portfolio, and it lays out the
2   methodologies and all of those issues, but Techquity Capital
3   Management, from whom those products were produced as can be
4   seen from Exhibit A and Exhibit B to defendants' motion,
5   Techquity Capital Management manages several other entities
6   with other portfolios that are not at issue in this case, so
7   we provided them with the evaluation methodologies.  We
8   performed limited redactions, which is a fairly common
9   practice in litigation, to protect information that is both
10   confidential and irrelevant to the case but still give the
11   defendants the information they're entitled to for purposes
12   of this case.
13     Our concern is that they go beyond just what is
14   relevant to this case, and the examples especially get into
15   the questioning of Ms. Divine at the deposition, which she
16   was pressed on her understanding of technology owned by
17   these other portfolios and what the patents cover.  And they
18   were very specific questions about the technology that were
19   pressed on Ms. Divine, which, of course, is how someone
20   would interpret patents can be an extremely sensitive issue
21   in litigation, as Your Honor well knows.
22     Also, at least two of the other entities that
23   Techquity Capital Management handles are actively involved
24   in litigation, that being TQ Delta and Evolved Wireless, so
25   I think I cited in our letter brief and the Court can see

1   from the review of the transcript that objections about
2   the privileges were raised throughout the deposition.
3     So there are concerns about having to reveal
4   information involving other pending litigation and there
5   could be anticipation of litigation by these other sister
6   entities that we know nothing about and are not involved in,
7   as we do not represent any of these entities and none of the
8   attorneys that represent those entities were present or had
9   an opportunity to address these issues.
10     So I think what they're seeking goes well beyond
11   anything that is relevant to the issues that the Court has
12   to decide or the jury will ultimately have to decide in this
13   case.
14     THE COURT:  Why isn't it all within a broad scope
15   of relevance as to at least the hypothetical negotiation and
16   be probative or likely to lead to admissible evidence as
17   to what type of royalty TQ Beta, the plaintiff here, would
18   accept?
19     MR. GILLILAND:  Well, I believe, Your Honor, we
20   produced that information.  For example, Exhibits A and B
21   provide valuations of what TQ Beta, of what a third party
22   value TQ Beta's portfolio using several different models or,
23   yeah, several different valuation methodologies.  The issue
24   becomes how those same methodologies apply to on the another
25   portfolio owned by another entity.  Those have no bearing on

1 valuations of TQ Beta's portfolio or what TQ Beta would
2 accept, so I would produce the information as it relates to
3 TQ Beta. But when it comes to TQ Delta, Evolved Wireless or
4 these other portfolios held by other entities, it is those
5 specific valuations that we believe that are irrelevant to
6 the case at hand. While they may be relevant in their other
7 litigation, they're not relevant here.
8 But we have produced that information as it
9 concerns TQ Beta, and what is described in the documents as
10 the place shifting portfolio, and then of course, the place
11 shifting portfolio includes more than just the patent at
12 issue in this case, but we produced all of that from those
13 valuations so that part is relevant.
14 Now, whether another unwritten entity holding
15 another patent might value its portfolio we think is
16 irrelevant. We think it gets into areas where it is
17 extremely confusing and misleading and has the potential to
18 result in tangential litigation there. Now the Court has
19 to analyze unrelated portfolios and how that might affect
20 values and whether it is covering different things. It
21 runs very far afield of the valuation of the hypothetical
22 negotiation over the '456 patent that is before the Court
23 and that is owned by the TQ Beta.
24 THE COURT: In terms of some of your redactions
25 to protect confidentiality, why is the protective order not

1 sufficient here to alleviate that concern and not require
2 redactions?
3 MR. GILLILAND: Your Honor, I would say those
4 redactions were in part based on confidentiality. They're
5 highly sensitive, especially when some of those portfolios
6 are still being valued.
7 We think with regard to the third-party entities
8 that may have invested in TQ Beta, we think that that raises
9 concerns about the privacy rights of those third parties who
10 haven't had a chance to address those to the Court. And
11 even under the operating agreement for Techquity and the
12 investor agreements that Techquity has, Techquity LP has
13 with these third-party investors, they have an obligation to
14 notify them before any of their identities are disclosed so
15 those third parties can address that as well as raising
16 concerns about trade secret privileges with regard to who
17 their investors are and where those investments come from,
18 especially when none of those third parties are investors in
19 the TQ Beta entity or portfolio.
20 So that would be the concern under the
21 protective order, Your Honor.
22 THE COURT: All right. Thank you.
23 Mr. Dhanani, is there any reply?
24 MR. DHANANI: Your Honor, to address that very
25 last point that counsel just raised. We don't even know who

1 is behind TQ Beta. As of now, we understand that it doesn't
2 have any other officers other than Ms. Divine who is part of
3 Techquity Capital Management, and we assume that she is also
4 part of Techquity.
5 So what Techquity has done at the top level is
6 created several entities. Each of those entities separately
7 doesn't contain much information and all of the information
8 that is relevant appears to reside and generated by
9 Techquity Capital Management, and we frankly don't know who
10 is behind this.
11 Now, to address some of the other concerns on
12 this. All of these portfolios appear to be related and
13 they're in the same field of engineering. It's akin to --
14 and I'll just compare it to the argument that counsel for
15 TQ Beta just made. They're asking for documents that have
16 confidential information of third parties and they're asking
17 you, Your Honor, to not produce -- to not let them produce
18 information of their own basically information that they,
19 themselves consider confidential for them, meaning their
20 own sister entities. So we do believe that that is the
21 information contained therein is relevant to the damages
22 inquiry as we have already said.
23 And to address some of the other points made,
24 there is a reference to third party rights in here, and I
25 believe you've already addressed these in the protective

1 order which is enough to address that concern.
2 There was also a statement made in the response
3 letter concerning trade secrets. We're not exactly sure
4 what specifically that is directed to but it leaves a lot
5 to know who is behind essentially Techquity who claims to
6 only own the entire interest in TQ Beta. We don't even know
7 who specifically owns or who specifically the person is that
8 purchased or is currently suing based on TQ Beta.
9 THE COURT: All right. Thank you.
10 I'm granting this motion to compel from the
11 defendants. I do so applying I think the same principles
12 that I applied with respect to the plaintiff's motion to
13 compel.
14 First, I have a fairly broad view of relevance,
15 at least in the context of this case, and I think how the
16 patentee in this case is performing its business and what
17 type of royalty it might be willing to accept and how
18 the related entities do so as articulated by the defendants
19 is within the very broad scope of relevance and likely to
20 lead to discovery of admissible evidence, all related to
21 at least the hypothetical negotiation and more broadly to
22 damages.
23 In particular, there appears to be a credible
24 argument at minimum that the patents involved or held by or
25 asserted by the related entities are at least, some of them,

1  in the same field as the patents-in-suit here.

2  In terms of confidentiality concerns, I haven't

3  heard a reason why the protective order isn't adequate

4  protection as I found it to be with respect to the earlier

5  motion to compel.

6  However, with respect to this motion, I do

7  hereby give, I order that the production that I'm ordering

8  today need not be made until 21 days from today.  So if

9  the plaintiff believes they have certain contractual

10  obligations, to give notice to third parties or others that

11  their information or identities is about to be disclosed

12  subject to a court order and subject to a protective

13  order, you will have time to do that.  And if somebody else wishes

14  to be heard within the 21-day period, I'm here, and you can

15  direct them to the fact that I'm here, and if they think

16  they have some other persuasive reason that I should

17  reevaluate my order, I'll be here to hear that.

18  Further, the deposition which I am further order-

19  ing is not to occur until after the documents are produced.

20  I find this ruling to keep the discovery proportionate to the

21  value of the case, and in terms of privilege, I'm not making

22  any ruling on privilege objection because, first off, it is

23  unclear to me whether the privilege objection was asserted

24  in a timely manner or whether it was discussed between the

25  parties, but, anyway, the defendant has indicated they're not

1  trying to overcome any privilege objection at this time,

2  and so I find I don't need to make any ruling on privilege.

3  I have just a few minutes remaining, but I want

4  to give you all a chance to briefly touch on the pending

5  motion for leave to amend.  Excuse me.  That is TQ Beta's

6  motion, so we'll hear first from TQ, please.

7  MR. LEONOUDAKIS:  Thank you, Your Honor.  This

8  is Ross Leonoudakis again.

9  The threshold issue with respect to the motion

10  to amend is diligence, and it is undisputed that TQ Beta

11  was diligent in seeking leave to amend its complaint after

12  it received the discovery in late November from the defendants.

13  It is not our delay.  We delayed seeking leave

14  at all.  We received that discovery November 20th, met

15  and conferred with the defendants on December 11th, and then

16  moved to amend on December 22nd.

17  The remaining question is whether TQ Beta knew

18  or should have known of the facts such as it could have

19  alleged willful infringement before it was produced.  The

20  answer is that TQ Beta did not.  With respect to actual

21  knowledge, the record shows that Ms. Divine did not have any

22  knowledge that the defendants received that same patent sale

23  offering that she did, and that it did in 2011.

24  Defendants' attempt to show Ms. Divine could

25  have asked at the center of it, she did ask who else

1  received the offering, that is not the case.  Ms. Divine was

2  simply seeking information about encumbrances, and there is

3  no evidence that shows that any question she may have asked,

4  that they responded at all.  There is no information that

5  said, that shows Ms. Divine had knowledge of who else

6  received the patent sale offering.  She also testified to

7  the same in her deposition that she did not inquire, nor did

8  she know about the identity of the other parties.

9  Nor is there evidence that TQ Beta should

10  have known about the identities of the other parties.  The

11  defendants imply that Ms. Divine simply could have just

12  asked for these identities of other parties that received

13  the package with minimal diligence, to quote their letter.

14  But the evidence shows just how unreasonable that proposition

15  is.

16  The offerings themselves were marked

17  confidential and, therefore, Ms. Divine could not have

18  discovered the contents of those offerings and, second of

19  all, the very e-mails that the defendants produced still

20  to this day is marked "restricted attorney eyes only," the

21  highest level of restriction under the protective order.  So

22  the thought that Ms. Divine could have simply discovered

23  this information with minimal diligence is just not true.

24  After diligence, the remaining issues are was

25  the amendment futile and whether it creates prejudice to

1  the defendants.  The amendment is not futile because it

2  was sufficiently pled and it is not barred by laches as the

3  defendants show.

4  The defendants state in a letter that the

5  proposed amendment never similarly alleges that the

6  defendants were notified of the infringement.  They call

7  it a critical failing when, in fact, that exact phrase as

8  put in plaintiff's amended motion, paragraph 47, says that

9  the defendants' infringement of the '456 has been willful

10  and they had notice and knowledge of the patent and their

11  infringement.

12  In addition to the rest of the willfulness

13  allegations, the *Seagate* test is a two-part test, and the

14  Court is aware of that.  I don't want to go into that too

15  deeply, but we're aware of the position that this discovery,

16  contents of it is enough to satisfy that *Seagate* test.

17  With that information in hand, the defendants

18  acted despite an objectively high likelihood that its

19  actions constituted infringement.  They don't contest the

20  fact that they knew of the patentee.  That was in their

21  docs.

22  Lastly, as to the laches defense, laches is not

23  a defense to willful infringement.  And there is evidence

24  that TQ Beta was aware more than six years prior to the

25  filing of this lawsuit that DISH was willfully infringing

# Exhibit G

REDACTED
IN ITS
ENTIRETY

EXHIBIT H

REDACTED
IN ITS
ENTIRETY

# EXHIBIT I

REDACTED
IN ITS
ENTIRETY

# EXHIBIT J

REDACTED
IN ITS
ENTIRETY

# EXHIBIT K

REDACTED

IN ITS

ENTIRETY

# EXHIBIT L

```
 1          IN THE UNITED STATES DISTRICT COURT

 2          FOR THE DISTRICT OF DELAWARE

 3  TQ DELTA LLC,              :

 4          Plaintiff,         : No. 15-cv-00615-RGA
                               :
 5      v.                     :
                               :
 6  TIME WARNER CABLE, INC.,   :
    et al.,                    :
 7          Defendants.        :

 8

 9              Tuesday, February 8, 2016
                1:00 p.m.

10

11              Discovery Dispute Hearing
                Courtroom of Judge Mary Pat Thynge

12

13              844 King Street
                Wilmington, Delaware

14  BEFORE:     THE HONORABLE Mary Pat Thynge,
                United States District Court Chief
15              Magistrate

16  APPEARANCES:

17

18              FARNAN LLP
                BY:  MICHAEL FARNAN, ESQ.

19

20                   -and-

21              McANDREWS HELD & MALLOY LTD
                BY:  SCOTT McBRIDE, ESQ.

22

23                On behalf of Plaintiff

24
```

```
 1  APPEARANCES CONTINUED:

 2

 3          MORRIS, NICHOLS, ARSHT & TUNNELL LLP
            BY:  JENNIFER YING, ESQ.

 4

 5                -and-

 6          DUANE MORRIS LLP
            BY:  WOODY JAMESON, ESQ.

 7              On behalf of Comcast, Cox, Time
                Warner Cable

 8

 9                -and-

10          ORRICK, HERRINGTON & SUTCLIFFE LLP
            BY:  ALEX CHACHKES, ESQ.

11              On behalf of DIRECTV

12

13          ROSS ARONSTAM & MORTIZ LLP
            BY:  BENJAMIN SCHLADWEILER, ESQ.

14

15                -and-

16          DUANE MORRIS LLP
            BY:  WOODY JAMESON, ESQ.

17              On behalf of Verizon

18          MORRIS, NICHOLS, ARSHT & TUNNELL LLP
            BY:  RODGER SMITH, ESQ.

19

20                -and-

21          COOLEY LLP
            BY:  STEPHEN McBRIDE, ESQ.

22              On behalf of DISH

23

24
```

```
 1          THE COURT:  Good afternoon to all

 2  of you.

 3          MR. SCHLADWEILER:  Good afternoon.

 4          MR. FARNAN:  Good afternoon.

 5          THE COURT:  Let's get some

 6  introductions.  Who's here on behalf of the

 7  Plaintiff, please?

 8          MR. FARNAN:  Good afternoon, Your

 9  Honor.

10          THE COURT:  Good afternoon.

11          MR. FARNAN:  Michael Farnan on

12  behalf of the Plaintiff, and with me today is

13  Scott McBride from McAndrews Held & Malloy in

14  Chicago.

15          MR. McBRIDE:  Good afternoon, Your

16  Honor.

17          THE COURT:  Good afternoon.  And

18  on behalf of the various Defendants?

19          MS. YING:  Good afternoon, Your

20  Honor.  Jennifer Ying from Morris, Nichols,

21  Arsht & Tunnel on behalf of Defendants Cox,

22  Comcast, Time Warner and DIRECTV.  With me at

23  counsel table, I have Woody Jameson from Duane

24  Morris also for Cox, Comcast, Time Warner and
```

```
 1  Verizon.

 2          THE COURT:  Good to see you,

 3  Mr. Jameson.

 4          MR. JAMESON:  Good to see you,

 5  Your Honor.

 6          MS. YING:  And also with me at

 7  counsel table is Alex Chachkes from Orrick and

 8  he's here on behalf of Defendant DIRECTV.  With

 9  the Court's permission, both Mr. Jameson and

10  Mr. Chachkes will be making argument on behalf

11  of the Defendants.

12          THE COURT:  All right.  Thank you.

13  Anybody else who wants to get introduced?

14          MR. SCHLADWEILER:  Good afternoon,

15  Your Honor.  Ben Schladwiler from Ross,

16  Aronstam & Moritz on behalf of Verizon along

17  with Mr. Jameson.

18          THE COURT:  All right.  Mr. Smith?

19          MR. SMITH:  Good afternoon, Your

20  Honor.  Last but not least, Rodger Smith from

21  Morris Nichols on behalf of Dish.  And I'm

22  joined by my co-counsel from the Cooley firm in

23  Virginia Steve McBride.

24          THE COURT:  Nice to meet you.
```

1    MR. McBRIDE:  Sure.

2    THE COURT:  My understanding is --

3 did you give me the entire protective order or

4 was it the Defense?

5    MR. McBRIDE:  The Defense gave you

6 the entire protective order.  Plaintiffs gave

7 you the contested provisions, but this language

8 is in 6A so it's in the contested provisions.

9    THE COURT:  And you highlighted

10 stuff so I will go with that.  Is that Exhibit

11 A?

12    MR. McBRIDE:  Yes, it is, Your

13 Honor.

14    THE COURT:  Page what?

15    MR. McBRIDE:  Page 2 and it's at

16 the top of Page 3.

17    THE COURT:  Okay.

18    MR. McBRIDE:  There's language in

19 there that refers to involving claims in any

20 patent application directly or indirectly

21 claiming priority to asserted patents or from

22 which asserted patent claims priority, so you've

23 got that protection already built in.  Even if

24 there are claims in technology that's beyond the

1 scope that they might say of the technology

2 that's at issue in this case but that otherwise

3 claims priority to these applications or to the

4 patents-in-suit, it's still going to be barred.

5 The prosecution of such applications would be

6 barred.

7    Everything else to the extent it's

8 disclosed to the attorneys or to the experts, to

9 the extent someone would try to rely on that

10 information, any new applications that might try

11 to be filed, all the information disclosed would

12 be prior art.  I think you've got adequate

13 protection right there because you've got the

14 agreed language with respect to the priority

15 claimed, so that's going to bar any prosecution

16 by the attorneys or any use by the experts in

17 connection with the applications that are

18 related to the patents-in-suit.

19    THE COURT:  Well, you also said

20 you thought that the -- what's the proper

21 verbiage for the technology that we have?  Is it

22 M-o-C-A or --

23    MR. McBRIDE:  MoCA.

24    THE COURT:  Okay.  Fine.  I didn't

1 know if it was actually pronounced like that or

2 whether you used the acronym.  You said also in

3 your argument at the bottom of Page 2 you make a

4 comment in the last full paragraph, that this

5 particular MoCA is a later technology that

6 barred heavily from the tested technologies like

7 DSL.  Isn't that an admission that there's a

8 strong relationship to the subject matter?

9    MR. McBRIDE:  I'm not sure I

10 follow, Your Honor.

11    THE COURT:  Okay.  Your concern is

12 that Defendants cover other technologies.  But

13 isn't this comment you made at the bottom of

14 Page 2 an admission of sorts or at least an

15 acknowledgement that to have your application of

16 what you're proposing would be way too narrow

17 and that basically there are other technologies

18 that are related and similar so that there's a

19 strong relationship between these two

20 technologies when you're talking about MoCA or

21 DSL?

22    MR. McBRIDE:  I still think, Your

23 Honor, the language in the protective order that

24 Plaintiff has proposed is broad enough because

1 you've got a situation where anything that's

2 claiming priority to the patents-in-suit are

3 going to be barred from prosecuting and anything

4 else, you've got a general prohibition on use in

5 the protective order of course.

6    Then you also have if someone

7 tries to use any information gained from the

8 lawsuit, if you try to put in a new application,

9 everything that Defendants already have is going

10 to be usable as prior art against them.  It's

11 not going to be usable to get a patent.

12    THE COURT:  All right.  Is TQ

13 Delta the Plaintiff actually actively

14 prosecuting patents?

15    MR. McBRIDE:  Yes, Your Honor.  TQ

16 Delta as mentioned in the papers agree with Your

17 Honor's observation that these two issues are

18 related and as mentioned TQ Delta is also

19 actively submitting technical innovations to the

20 ITU.

21    THE COURT:  I understand that.

22 But the question is, is TQ Delta the one who is

23 actively pursuing patent prosecution, that is,

24 pursuing patents or is it the fact that TQ Delta

1| buys patents from inventors?  In other words,
2| once you get a patent from the inventor, do you
3| have any continuations?  Is TQ Delta actually
4| pursuing patents?
5|         MR. McBRIDE:  It's my
6| understanding that's TQ Delta, Your Honor.
7|         THE COURT:  All right.
8|         MR. McBRIDE:  And with respect tc
9| the overbroad language, the Defendants have
10| proposed -- I think it's proposed only because
11| the Defendants have proposed a unilateral bar.
12| If it were bilateral, I don't think this
13| language would be in there at all.
14|         THE COURT:  Well, that was the
15| question that I had for the Defense frankly.
16|         MR. McBRIDE:  Okay.
17|         THE COURT:  Why should it be by
18| the way bilateral?  There's a whole host of
19| cases that basically say now you don't need it,
20| and particularly from Judge Andrews.
21|         MR. McBRIDE:  And that gets to
22| Exhibit 1, the declaration from Elva Devine(ph).
23| So that's where we get into the submissions by
24| TQ Delta to the International Telecom Union.  So

1| in the last two and a half years alone, since
2| 2013, TQ Delta submitted 10 technological
3| proposals to the International Telecom Union for
4| improvements to the ITU standards, so these are
5| technological advancements, inventions,
6| innovations and improvements.  And you've got --
7|         THE COURT:  Explain to me how that
8| matters.  In other words, besides the conclusory
9| statement that was mentioned in Paragraph 9,
10| explain to me how if application of the
11| prosecution bar how having it just against the
12| Plaintiff is going to be so horribly
13| problematic?
14|         MR. McBRIDE:  What you've got on
15| the one hand is you've got the Defendants saying
16| we're coming up with new products so, you, TQ
17| Delta shouldn't be allowed to look at our
18| proposed new products and then to prosecute
19| patent applications directed to the products.
20| But at the same time, Defendant is referring to
21| TQ Delta as a patent assertion entity or
22| nonpracticing entity.
23|         Well, TQ Delta itself is
24| innovating, TQ Delta is submitting technological

1| innovations to the International Telecom Union.
2| And in order to rebut the assertion it's a
3| nonpracticing entity, TQ Delta intends to
4| introduce some of that evidence or may have to.
5| In the same way that Defendants say they're
6| coming up with new products, TQ Delta is coming
7| up with new innovations as well.
8|         And you have Defendants, including
9| at least DIRECTV in terms of one published
10| application that we've located, that is engaged
11| in patent application activity directed to and
12| entitled and published applications on Page 3 of
13| patent owner's opening letter Phase, Noise and
14| Frequency Air Resilient Demodulation Scheme for
15| MoCA.
16|         So on the one hand while you have
17| Defendants saying we're coming up with new
18| products, you, patent owner, shouldn't be able
19| to see our new innovations and direct patents to
20| that, TQ Delta has the same argument because
21| it's not the -- it doesn't stand in the same
22| shoes as the cases to which Defendants have
23| pointed in terms of the other Plaintiffs to
24| which Defendant is pointing.

1|         THE COURT:  Did TQ Delta prosecute
2| the patents in this case?
3|         MR. McBRIDE:  Originally?
4|         THE COURT:  Yes.
5|         MR. McBRIDE:  I believe the answer
6| is no.
7|         THE COURT:  So they were bought
8| from the inventors or purchased in some fashion?
9|         MR. McBRIDE:  I believe that's
10| correct, Your Honor.  I'm not sure for every
11| single one.  I would have to double check.
12| Depending on the exact timing, they may be
13| slightly different depending on each one.
14|         THE COURT:  Are any of the patents
15| that are involved in this litigation patents
16| that TQ Delta has gotten CIPs or continuations
17| or have used those patents to advance and
18| proceed with new patents before the PTO?
19|         MR. McBRIDE:  Yes, there are
20| continuations.  I don't believe there are any
21| continuations in part.
22|         THE COURT:  And that would be TQ
23| Delta doing this rather than another entity?
24|         MR. McBRIDE:  I believe TQ Delta